## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re OWENS CORNING, INC., *et al.*,<br><br>Debtors. | Bankruptcy Case No. 00-3837 (JKF) |
| *AD HOC* COMMITTEE OF PREFERRED AND EQUITY SECURITY HOLDERS,<br><br>Appellant,<br><br>v.<br><br>OWENS CORNING, *et al.*,<br><br>Appellee. | Civil Action No. 06-184 (JPF) |

## ANSWERING BRIEF OF APPELLEE, OWENS CORNING, *ET AL.*

**SAUL EWING LLP**
Norman L. Pernick (No. 2290)
Mark Minuti (No. 2659)
J. Kate Stickles (No. 2917)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE  19899-1266
(302) 421-6800

**SIDLEY AUSTIN LLP**
James F. Conlan
Larry J. Nyhan
Jeffrey C. Steen
Dennis M. Twomey
One South Dearborn Street
Chicago, IL  60603
(312) 853-7000

- And -

Guy S. Neal
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000

Attorneys for Appellee, Owens Corning, *et al.*

Dated:  April 18, 2006

534850.1 4/18/06

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

STANDARD OF REVIEW ..............................................................................................1

STATEMENT OF THE FACTS ......................................................................................2

      A.    The Chapter 11 Cases ..............................................................................2

      B.    The Business of the Debtors ....................................................................2

      C.    The Debtors' Good Faith Efforts To Confirm A Plan ...............................3

            i.      The Recusal of Judge Wolin ..............................................3

            ii.     Substantive Consolidation ................................................3

            iii.    Asbestos Claims Valuation Process .................................4

      D.    The Plan and the Debtors' Exclusivity Motion ...........................................5

      E.    The *Ad Hoc* Committee's Hinder and Delay Strategy ................................6

      F.    The January 30, 2006 Hearing On The Exclusivity Motion .......................7

      G.    The Exclusivity Order and the Current Status Of The
            Debtors' Bankruptcy Cases ....................................................................11

SUMMARY OF ARGUMENT .........................................................................................14

ARGUMENT ...................................................................................................................15

      I.     THE BANKRUPTCY COURT DID NOT PLACE THE
            BURDEN OF PROOF ON THE *AD HOC* COMMITTEE
            TO OPPOSE THE EXCLUSIVITY MOTION .........................................16

      II.    THE DEBTORS HAVE MADE GOOD FAITH PROGRESS
            TOWARD REORGANIZATION ..............................................................18

      III.   THE *AD HOC* COMMITTEE'S CORPORATE GOVERNANCE
            ARGUMENTS ARE NOT PROPERLY BEFORE THE COURT,
            AND IN ANY EVENT, ARE WRONG AS A MATTER OF LAW ........20

CONCLUSION ...............................................................................................................25

## TABLE OF AUTHORITIES

### CASES

Bank of America Nat'l Trust and Sav. Ass'n. v. 203 N. LaSalle Street P'ship,
    526 U.S. 434 (1999) ..................................................................................19

Benak v. Alliance Capital Mgmt. L.P.,
    435 F.3d 396 (3d Cir. 2006)......................................................................12

Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince),
    40 F.3d 356 (11th Cir. 1994) ......................................................................1

FGH Realty Credit v. Newark Airport/Hotel Ltd.,
    155 B.R. 93 (D.N.J. 1993)..........................................................................1

Flom v. Hedback (In re Flom),
    814 F.2d 558 (8th Cir. 1987) ....................................................................21

Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geriatrics Nursing
Home, Inc.),
    187 B.R. 128 (D.N.J. 1995).........................................................1, 16, 19

Ieradi v. Mylan Laboratories, Inc.,
    230 F.3d 594 (3d Cir. 2000) ....................................................................12

In re Christian,
    804 F.2d 46 (3d Cir. 1986) ......................................................................21

In re Express One Int'l Inc.,
    194 B.R. 98 (Bankr. E.D. Tex. 1996)...............................................16, 18

In re Federated Dept. Stores, Inc.,
    133 B.R. 886 (S.D. Ohio 1991) ...............................................................23

In re Gibson & Cushman Dredging Corp.,
    101 B.R. 405 (E.D.N.Y. 1989) .........................................................1, 16

In re Grand Traverse Dev. Co. Ltd. P'ship,
    147 B.R. 418 (Bankr. W.D. Mich. 1992) ................................................16

In re Henry Mayo Newhall Mem'l Hosp.,
    282 B. R. 444 (9th Cir. B.A.P. 2002) .......................................................1

In re Johns-Manville Corp.,
    52 B.R. 879 (Bankr. S.D.N.Y. 1985)......................................................23

In re McLean Indus., Inc.,
    87 B.R. 830 (Bankr. S.D.N.Y 1987)........................................................................16

In re Owens Corning, Inc., et al.,
    Chapter 11, Case No. 00-3837.......................................................................passim

In re Owens Corning, Inc., et al.,
    United States District Court for the District of Delaware,
    Case No. 04-905 ...........................................................................................4

In re Owens Corning, Inc., et al.,
    United States District Court for the District of Delaware,
    Case No. 06-136 ....................................................................................21, 22

In re Sharon Steel Corp.,
    871 F.2d 1217 (3$^d$ Cir. 1989).........................................................................1

In re United Press Int'l, Inc.,
    60 B.R. 265 (Bankr. D. Dist. Col. 1986) ............................................................23

Int'l Union v. Mack Trucks, Inc.,
    820 F.2d 91 (3$^d$ Cir. 1987)............................................................................1

N.L.R.B. v. Frazier,
    966 F.2d 812 (3$^d$ Cir. 1992) .........................................................................1

Palms Associates v. Video Update, Inc. (In re Video Update, Inc.),
    2005 WL 1277741 (D. Del. 2005)....................................................................1

Peters v. Delaware River Port Auth.,
    16 F.3d 1346 (3$^d$ Cir. 1994).........................................................................12

United States v. Pozsgai,
    999 F.2d 719 (3$^d$ Cir. 1993)........................................................................12

Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.,
    50 F.3d 253 (3$^d$ Cir. 1995).........................................................................1

## STATUTES

11 U.S.C. § 1121 ........................................................................................16

11 U.S.C. § 1121(b)....................................................................................15

11 U.S.C. § 1121(c) ................................................................................15

11 U.S.C. § 1121(d) ........................................................................1, 11, 15

11 U.S.C. § 1129(a)(3) .......................................................................14, 18

28 U.S.C. § 158 ......................................................................................21

28 U.S.C. § 158(a) .................................................................................21

Del. Code Ann. tit. 8, § 211(c) ................................................................23

Del. Code Ann. tit. 8, § 303 ...................................................................22

Del. Code Ann. tit. 8, § 303(a) ..........................................................22, 23

Fed. R. Evid. 201 ...................................................................................12

## OTHER AUTHORITIES

Brody Mullins, "Asbestos Trust Fund Bill
is Defeated," Wall St. J., Feb. 15, 2006 ...................................................12

Fairness in Asbestos Injury Resolution Act of 2005,
Bill S. 852 .....................................................................................passim

James Gunsalus, "W.R. Grace, Owens Corning Fall
After Asbestos Legislation Fails," Bloomberg, Feb. 15, 2006 ...........................12

James Rowley, "Asbestos Fund Leaders Seek Votes to
Save Legislation," Bloomberg, Feb. 14, 2006 .............................................12

James Rowley and Michael McKee, "Asbestos Trust Fund
Alternative May Get Debate, Senator Says," Bloomberg, Feb. 16, 2006 ..............12

## STANDARD OF REVIEW

The appropriate standard of review governing an appeal of an order granting an extension of a debtor's exclusive periods to file and solicit acceptance of a plan under 11 U.S.C. § 1121(d) was summarized in Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geratrics Nursing Home, Inc.), 187 B.R. 128 (D.N.J. 1995), as follows:

> The standard of review to be employed on an appeal from the Bankruptcy Court is narrow in scope: "an order altering the exclusivity period will not be set aside absent an abuse of discretion." *In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409 (E.D.N.Y. 1989)* (citation omitted). Abuse of discretion can be found when a "judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc., 50 F.3d 253, 257 (3ᵈ Cir. 1995)* (citing *Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince), 40 F.3d 356, 359 (11ᵗʰ Cir. 1994)*). *See also N.L.R.B. v. Frazier, 966 F.2d 812, 815 (3ᵈ Cir. 1992)* (quoting *Int'l Union v. Mack Trucks, Inc., 820 F.2d 91, 95 (3ᵈ Cir. 1987)*. . . . To the extent that the Bankruptcy Judge rested her conclusion . . . on legal issues, the Court shall engage in plenary review of that determination. As to any factual conclusions which led the Bankruptcy Court to conclude as it did, this Court will give them great deference unless such factual determinations were clearly erroneous. Where the Bankruptcy Court's decision was based upon mixed issues of fact and law, this Court shall apply the appropriate standard to each component as it contributed to the decision below. *In re Sharon Steel Corp., 871 F.2d 1217, 1223 (3ᵈ Cir. 1989)*; *FGH Realty, supra, 155 B.R. at 97* (citations omitted).

187 B. R. at 131 (citations omitted). *See also* Palms Associates v. Video Update, Inc. (In re Video Update, Inc.), 2005 WL 1277741 (D. Del. 2005) (holding in a non-exclusivity appeal that fact findings are reviewed under a "clearly erroneous" standard, questions of law subject to "plenary review" and mixed questions of law and fact are subject to a "mixed standard of review") (copy attached as Exhibit 1); *but see*, In re Henry Mayo Newhall Mem'l Hosp., 282 B. R. 444, 452 (9ᵗʰ Cir. B.A.P. 2002) (holding that a determination of "cause" under 11 U.S.C. § 1121(d) is subject to *de novo* review).

## STATEMENT OF THE FACTS

**A.      The Chapter 11 Cases**

On October 5, 2000 (the "Petition Date"), Owens Corning and 17 affiliates

(collectively the "Company" or the "Debtors") filed voluntary petitions for reorganization

relief under chapter 11 of the Bankruptcy Code.  *See* In re Owens Corning, Inc., *et al.*,

Chapter 11, Case No. 00-3837, Docket No. 1 (hereinafter "Bankr. Docket No. ___").

On October 23, 2000, the United States Trustee appointed the Official Committee

of General Unsecured Creditors and the Official Committee of Asbestos Claimants (the

"Asbestos Committee").  *See* Bankr. Docket Nos. 174 and 175.  By Order dated

September 28, 2001, the Court appointed James J. McMonagle, Esquire as the "Futures

Representative" in connection with the Debtors' cases.  *See* Bankr. Docket No. 3218.

**B.      The Business of the Debtors**

The Company is a world leader in the manufacture and sale of building material

systems and composites systems.  *See* Disclosure Statement With Respect to Fifth

Amended Joint Plan of Reorganization for Owens Corning and Its Affiliated Debtors and

Debtors-in-Possession (the "Disclosure Statement") (Bankr. Docket No. 16569) at 5.  The

Company produces and sells insulation, roofing systems, exterior systems for the home

and glass fiber materials used in composites.  *Id.* at 6.  The Debtors conduct their

manufacturing, distribution and sales operations primarily in the United States, but the

Company has operations worldwide.  *Id.* at 5.  The Company had net sales of

approximately $6.1 billion for the last twelve months ending September 30, 2005.  *See*

November 14, 2005 Bankr. Ct. Transcript (the "November Transcript") at 20.  The

Company employs approximately 20,000 persons worldwide and is headquartered in

534850.1 4/18/06

Toledo, Ohio. *Id.* Excluding provisions for asbestos litigation claims, Owens Corning has been profitable for years. *See* Disclosure Statement at 29.

The Debtors commenced these chapter 11 cases to protect the Company's business and value for all of its constituents, and to resolve all claims, including asbestos claims, asserted against it. *See* Disclosure Statement at 27-29.

**C.     The Debtors' Good Faith Efforts To Confirm A Plan**

On January 17, 2003, the Debtors, together with the Asbestos Committee and the Futures Representative filed their Joint Plan of Reorganization for Owens Corning and its Affiliated Debtors and Debtors-in-Possession. *See* Bankr. Docket No. 6756. On March 28, 2003, the plan proponents filed an amended version of such plan, together with a disclosure statement. *See* Bankr. Docket No. 7438. A number of factors, beyond the Debtors' control, prohibited the Debtors from moving forward with the joint plan and disclosure statement prior to August 15, 2005.

**i.     The Recusal of Judge Wolin**

First, a Petition for Writ of Mandamus was filed in the United States Court of Appeals for the Third Circuit (the "Third Circuit") seeking the recusal of Judge Wolin and a Writ of Mandamus was ultimately issued directing Judge Wolin to recuse himself from further participation in these cases. *See* Bankr. Docket Nos. 11683 and 11712. Thereafter, this Court was appointed to preside over these cases.

**ii.     Substantive Consolidation**

Second, litigation continued regarding substantive consolidation. Between April 8, 2003 and May 2, 2003, Judge Wolin presided over a hearing on the Debtors' motion for approval of substantive consolidation as part of the joint plan, but did not

issue a ruling prior to his recusal. Upon its appointment, this Court reviewed the transcripts and exhibits of the substantive consolidation hearing, ordered additional briefing and argument and, on October 5, 2004, issued an order granting the substantive consolidation motion. *See* Bankr. Docket No. 12855.

Credit Suisse, as Agent (the "Bank Debt Holders") filed a notice of appeal from the substantive consolidation order to the Third Circuit. *See* Bankr. Docket No. 12932. On August 15, 2005, the Third Circuit reversed the order granting substantive consolidation. *See* Bankr. Docket No. 15653. Thereafter, the Third Circuit denied several petitions for rehearing regarding such ruling. The Futures Representative and certain bondholders (the "Bondholders") filed Petitions for Writ of Certiorari with the United States Supreme Court. Recently, the Bank Debt Holders filed their brief in opposition to these Petitions.

**iii.     Asbestos Claims Valuation Process**

Third, this Court withdrew the reference with respect to the asbestos claims estimation process and held a hearing, from January 13 to January 20, 2005, to determine the aggregate amount of the Debtors' asbestos personal injury liabilities. *See* In re Owens Corning, Inc., *et al.*, United States District Court for the District of Delaware, Case No. 04-905, Docket No. 7. By Order dated March 31, 2005, this Court issued a decision estimating Owens Corning's aggregate present and future asbestos liabilities at $7.0 billion. *See* Bankr. Docket No. 14792. Certain parties in interest filed notices of appeal of the estimation decision to the Third Circuit. In early December of 2005, the Third Circuit issued a briefing schedule for these appeals. No date for oral argument has been set as of this date.

**D.**    **The Plan and the Debtors' Exclusivity Motion**

Between the date the Third Circuit issued its decision on substantive

consolidation in August and the end of December 2005, the Debtors negotiated with their

key creditor groups in the hope of reaching agreement on the terms of a consensual plan.

*See* November Transcript at 23-25; *see also* January Transcript at 10-14.  Equally as

important, the Debtors fostered and facilitated direct discussions between certain of its

key creditor groups.  *Id.*

On December 31, 2005, the Debtors filed their Fifth Amended Plan of

Reorganization (the "Plan") and accompanying Disclosure Statement.  *See* Bankr. Docket

No. 6569.  The Asbestos Committee and Futures Representative are co-proponents of the

Plan and the Steering Committee of the Debtors' Bank Debt Holders support the Plan.

After the December 31, 2005 Plan filing date, the Agent was authorized by a majority of

the Bank Debt Holders to support the Plan.  Accordingly, as of today, representatives of

holders of approximately 85% of the more than $10 billion of pre-petition unsecured

claims against Owens Corning support the Plan, and are invested in a fair and orderly

plan confirmation process.  *See* January 30, 2006 Bankr. Ct. Transcript (the "January

Transcript") at 81-83.

The Plan modifies previous versions of the joint plan and gives full credit to both

the Third Circuit's ruling on substantive consolidation and this Court's ruling on asbestos

claims estimation.  The filing by the Debtors – with the consent of key creditor

constituencies – of a confirmable Plan marks real and substantial progress toward an

orderly emergence from Chapter 11.

Unfortunately, the Plan does not provide for any distribution to equity, as there is no plausible analysis under current facts and circumstances that would lead to a conclusion that Owens Corning's assets exceed its liabilities,[1] which include: (a) administrative and priority claims of approximately $135 million; (b) bank debt of approximately $1.467 billion (exclusive of interest); (c) bond debt of approximately $1.4 billion; (d) trade and other general unsecured debt in excess of $275 million; (e) asbestos liabilities of $7 billion as found by this Court; and (f) another $275 million in subordinated debt. *See* January Transcript at 65-67 and Disclosure Statement at vi-x. This would be in addition to Fibreboard's assets and liabilities, including its asbestos liabilities.

Also on December 31, 2005, the Debtors filed the Motion of Debtors for Order, Pursuant to 11 U.S.C. § 1121(d), Granting Further Extension of Exclusive Periods to File and Solicit Acceptances of Plan of Reorganization (the "Exclusivity Motion"). *See* Bankr. Docket No. 16571. By the Exclusivity Motion, the Debtors sought an extension of the exclusive periods under which the Debtors only can file and solicit acceptance (the "Exclusive Periods") of a plan under 11 U.S.C. § 1121(d).

**E.    The *Ad Hoc* Committee's Hinder and Delay Strategy**

Five years into the Debtors' bankruptcy cases, the so called *Ad Hoc* Committee of Preferred and Equity Security Holders (the "*Ad Hoc* Committee") first surfaced and began to implement a strategy to hinder and delay these cases. On December 20, 2005, the *Ad Hoc* Committee filed companion motions seeking the appointment of an official

---

[1]    The Debtors' financial advisors have concluded that the Total Distributable Value (as defined in the Plan) of the Reorganized Debtors as of December 31, 2005 ranges from approximately $5.9 to $6.7 billion, plus the segregated assets of Fibreboard (primarily the Fibreboard Trust).

equity holders' committee (the "Equity Committee Motion") and authority to file an

action in the Chancery Court of the State of Delaware to compel a shareholders' meeting

(the "Shareholder Motion," together with the Equity Committee Motion as the "*Ad Hoc*

Committee Motions"). *See* Bankr. Docket No. 16495 and 16496.  On January 13, 2006,

the *Ad Hoc* Committee filed its objection (the "Objection") to the Exclusivity Motion.[2]

*See* Bankr. Docket No. 16695.

Nowhere in any of its pleadings does the *Ad Hoc* Committee challenge, under the

facts and law as they exist today, and in this record, that equity is out of the money.

Instead, the *Ad Hoc* Committee all but concedes that the *Ad Hoc* Committee Motions and

its Objection were based upon nothing more than the mere hope that (1) the Fairness in

Asbestos Injury Resolution Act of 2005, Bill S. 852 (the "FAIR Act") may be enacted at

some indeterminate time in the future and (2) this Court's $7 billion estimation of Owens

Corning's asbestos-related liabilities may be reversed by the Third Circuit, coupled with

the conjecture that one or both events may provide a payout to equity holders who are

unfortunately out of the money in these cases.

## F.    The January 30, 2006 Hearing On The Exclusivity Motion

At the January 30, 2006 hearing on the Exclusivity Motion (the "Hearing"), the

Bankruptcy Court incorporated by reference, without objection, the Debtors' extensive

testimonial proffer of Steven K. Krull, the Senior Vice President, General Counsel and

Secretary of Owens Corning, offered at the November 14, 2005 hearing (the "Krull

Proffer"). *See* January Transcript at 9-10.  The Krull Proffer included a detailed account

---

[2]    Objections to the Exclusivity Motion were also filed by the Official
       Representatives of the Bondholders and Trade Creditors of Owens Corning
       (Bankr. Docket No. 16696) and certain Bondholders (Bankr. Docket No. 16668).
       Neither of these parties have joined in this appeal.

of the size and complexity of the Debtors' cases, the Debtors' managements' outstanding operational performance, the Debtors' diligent prosecution of these chapter 11 cases and the obstacles which have precluded the parties from moving toward plan confirmation, including the recusal of Judge Wolin and litigation over substantive consolidation and asbestos liability estimation. *See* November Transcript at 20-29. The Krull Proffer also included a detailed account of the Debtors' good faith plan negotiations as of the end of November. *Id.*

The Bankruptcy Court also considered the Debtors' filed Plan and Disclosure Statement which includes as co-proponents the Asbestos Committee and Futures Representative and which has the support of the Debtors' Bank Debt Holders' Steering Committee. *See* January Transcript at 8 and 42. Finally, the Bankruptcy Court considered the Debtors' proffer regarding the state of negotiations among the key creditor groups since November which led to the filing of the Plan and Disclosure Statement and the Debtors' commitment to continue to work, in good faith, to resolve any legitimate obstacles to confirmation. *See* January Transcript at 10-31. The evidence presented by the Debtors in support of the Exclusivity Motion was unrebutted.[3]

The *Ad Hoc* Committee offered no evidence in support of its Objection and did not challenge the Debtors' proffers or any of the evidence offered by the Debtors to support the Exclusivity Motion. Instead, the *Ad Hoc* Committee's sole arguments at the Hearing were that the Debtors had not proceeded in good faith because they failed to

---

[3]    The Bondholders did take issue with the Debtors' characterization of the discussions between the Debtors' and the Bondholders. *See* January Transcript at 13.

negotiate with the *Ad Hoc* Committee and account in the Plan for the possibility of the passage of the FAIR Act. *See* January Transcript at 34-42.

As demonstrated by the following colloquy, the Bankruptcy Court quickly, and appropriately, disposed of the *Ad Hoc* Committee's arguments premised on the speculative and uncertain passage of the FAIR Act:

> MR. GRAY: Well, Your Honor, I would submit to Your Honor that if the FAIR Act is passed there is substantial value for equity, and I can go through the numbers now if you'd like or it can wait for my presentation on the –
>
> THE COURT: It's irrelevant. It's irrelevant, but the FAIR Act has not passed, and so, frankly, it is not something that I can consider in valuing the debtor right now. The Court has to look at what the value of the debtor is now not what a hypothetical value of the debtor may be based on pending legislation that may or may not pass, and if it does, may or may not pass in the near term, and if it does, may or may not look anything like what it looks like now. That's all hypothetical. This Court, you know, I understand the need for making estimations, but that's going too far.
>
> MR. GRAY: Well, I believe, Your Honor, that the FAIR Act should be included in the calculus. I believe, as well, that the good faith requirement of 1129(a)(3) requires that a plan be proposed in good faith. There are models out there, Your Honor, the Babcock & Wilcox case and now USG –
>
> THE COURT: It doesn't matter.
>
> MR. GRAY: - that include that component –
>
> THE COURT: It doesn't matter. Every case is adjudged on its own facts. I see nothing in this case that indicates that this debtor is acting in bad faith. The debtor has waited for the Third Circuit to come down with the substantive consolidation trial. The Third Circuit has made a ruling. The debtor has incorporated the provisions into its plan, which is a very different kind of plan than it was beforehand before that ruling came down when the debtor was attempting to convince the Circuit of something that the debtor lost on. So, how can you say that the debtor, which is now taking cognizance of the law in a fashion that the debtor didn't want to advocate, is in bad faith?

MR. GRAY: Well, that's the substantive consolidation issue, Your Honor. I'm focused on the FAIR Act issue, and I believe that the FAIR Act issue –

THE COURT: You can stop that argument. The FAIR Act is not law. That would be - my telling the debtor to take cognizance of the FAIR Act would be the same thing as my telling the debtor to take cognizance of a pension change or a tax code change that might happen or might not happen 25 years in the future or maybe tomorrow. Who knows? You know, you wouldn't be here arguing that because there is pending legislation that says that the debtor may be subject to a significantly higher tax claim based on the passage of an act, that the debtor should take advantage of that or should take cognizance of that fact. Why should the debtor take the FAIR Act into consideration?

\* \* \*

So at this point in time the debtor's valuation tends in its view to say that there is no value for equity. That is the extent of its fiduciary obligation with respect to equity. It can't do anything if it can't return a return to equity.

MR. GRAY: Okay, but I disagree. Your Honor. I think they can taking into account the FAIR Act. Thank you.

\* \* \*

THE COURT: All right. I see no basis on which to terminate the debtor's exclusivity under these circumstances. The debtor does have a plan on the table. I don't know whether it will be confirmed, but at least facially, it looks as though it is confirmable. I haven't heard objections and so I'm not making rulings, but my statement to the debtor was to put a plan of record that at least facially is confirmable. The debtor's done it. Now, whether something will come up that makes it un-confirmable, I don't know, but at least from a first blush, first read, *prima facie* level it looks as though this plan can be confirmed. So, I think the debtor has done what the Court has ordered and what its fiduciary obligations are to all constituents. I do want the debtor to continue to negotiate with the bonds because I think that's an important aspect of this case, and perhaps there is still some adjustment that can be made that will get the bonds onboard. With respect to the equity, I haven't heard anything in this case at this point that convinces me that there is any value for equity in this case, and, you know, that's a sad thing. I'm not happy with that - resolution, nonetheless, it seems to me right now to be the state of the facts. To the extent that the debtor wants to somehow or other tweak this to incorporate whatever the FAIR Act is going to be if and when it's ever

passed at some point in the future, certainly I guess you can build plans on hypotheticals if you choose to do it and the parties agree. I think you've got a higher or not - I was going to say burden, but I don't mean it in that sense. I think you'll have a more difficult task if it's not going to be a cash plan then USG did in negotiating. You know, if you want to take a stab at it, I think that's the debtor's obligation, but I - in no way do I see how the debtor ought to be compelled to take advantage of an act that is not legislation, that's gone through several modifications already and that may, if it ever gets passed, come out of Congress as a much different vehicle than it went in. So, I don't know how you accommodate that action without the consent of all the constituents who would be governed by that, and that would, in that instance, I think, include equity, but there is no law at the moment that the debtor has to take cognizance of, and I'm certainly not going to order the debtor to take cognizance of a statute that doesn't exist.

*Id.*

### G.   The Exclusivity Order and the Current Status Of The Debtors' Bankruptcy Cases

By order dated February 13, 2006 (the "Exclusivity Order"), the Court approved

the Debtors' Exclusivity Motion and extended the Exclusive Periods through and

including July 31, 2006. *See* Bankr. Docket No. 16933. The Exclusivity Order expressly

provides that the Debtors had met their evidentiary burden under 11 U.S.C. § 1121(d):

B.   For the reasons set forth in the Motion, sufficient cause exists to extend the Exclusive Periods through and including July 31, 2006, because, among other things:

(1)   the Debtors' cases are extremely large and complex;

(2)   the Debtors have made good faith progress toward proposing a plan of reorganization;

(3)   sufficient time is necessary to permit the Debtors to negotiate an amended plan of reorganization;

(4)   the Debtors are not using exclusivity to prejudice creditors; and

(5)   granting the relief requested would not prejudice any party-in-interest.

        C.      The relief requested in the Motion is appropriate and necessary to assist the Debtors in their efforts to reorganize or otherwise maximize the value of their estates;

*Id.*

A hearing is currently scheduled for approval of the Disclosure Statement on May 10, 2006 and a hearing on confirmation of the Plan is scheduled to begin on July 10, 2006.

Meanwhile, the prospect of Congressional approval of the FAIR Act has become even more remote. This Court can take judicial notice[4] of the fact that on February 14, 2006, the Senate engaged in a vote on a procedural objection to the FAIR Act and failed to obtain the 60 votes necessary to keep debate on the FAIR Act alive. *See* James Rowley, "Asbestos Fund Leaders Seek Votes to Save Legislation," Bloomberg, Feb. 14, 2006 (copy attached as Exhibit 2); Brody Mullins, "Asbestos Trust Fund Bill is Defeated," Wall St. J., p. A10, Feb. 15, 2006 (copy attached as Exhibit 3). As a result of this vote, the legislation has been withdrawn from the Senate floor. *See* James Gunsalus, "W.R. Grace, Owens Corning Fall After Asbestos Legislation Fails," Bloomberg, Feb. 15, 2006 (copy attached as Exhibit 4). Senate Majority Leader Frist has subsequently said that he only plans to bring the bill up again if he is assured of winning the 60 votes necessary to keep debate alive. *See* James Rowley and Michael McKee, "Asbestos Trust Fund Alternative May Get Debate, Senator Says," Bloomberg, Feb. 16,

---

[4]    See Fed. R. Evid. 201; see Benak v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 401 n.15 (3[d] Cir. 2006) (validating District Court's decision to take judicial notice of newspaper articles supplied by appellees); Ieradi v. Mylan Laboratories, Inc., 230 F.3d 594, 598 n.2 (3[d] Cir. 2000) (taking judicial notice of article in N.Y. Times); see Peters v. Delaware River Port Auth., 16 F.3d 1346, 1356 (3[d] Cir. 1994) (taking judicial notice of newspaper articles); United States v. Pozsgai, 999 F.2d 719, 731 (3[d] Cir. 1993) (appellate court may take judicial notice of matter although trial court did not).

2006 (copy attached as Exhibit 5). Although the *Ad Hoc* Committee continues to trumpet the prospects of legislation that has now languished in the Congress for over three years, it is fair to conclude that, as of the date of this brief, the likelihood of passage of the FAIR Act has certainly not increased since the Hearing.

Nevertheless, on February 23, 2006, the *Ad Hoc* Committee filed its Notice of Appeal. *See* Bankr. Docket No. 17017.

## SUMMARY OF ARGUMENT

This appeal is another improper attempt by the *Ad Hoc* Committee to throw a "monkey wrench" into the Debtors' reorganization efforts in the hope of forcing parties to capitulate to a return for equity holders who, based upon the facts and law as they exist today, are hopelessly out of the money. Based on the extensive record below, the Bankruptcy Court appropriately exercised its discretion to grant the Debtors an extension of their Exclusive Periods and there is no basis for overturning the Exclusivity Order on appeal.

The *Ad Hoc* Committee's argument that the Bankruptcy Court improperly placed the burden of proof on the *Ad Hoc* Committee to oppose the Exclusivity Motion ignores the extensive record below, the totality of the Bankruptcy Court's statements at the Hearing and the express findings in the Exclusivity Order. The complete record below demonstrates that the burden of proof, at all time, rested with the Debtors and that the Debtors easily met their burden.

The main predicate for the *Ad Hoc* Committee's appeal, i.e., that the Debtors are not proceeding in good faith because they have not included an out-of-the-money class in plan negotiations and forced upon their creditor groups a plan which includes a return to equity premised on the passage of the FAIR Act and the reversal of this Court's ruling on asbestos liability estimation, finds no support in law or common sense.

The *Ad Hoc* Committee has prematurely attacked the Debtors' Plan as not proposed in good faith, but this issue will be decided at the hearing on confirmation of the Debtors' Plan under 11 U.S.C. § 1129(a)(3). At this stage, the issue is whether the Debtors have made good faith progress toward confirmation to warrant an extension of

their Exclusive Periods. On this point, the evidence is unrebutted that the Debtors have prosecuted these large and complex cases in a diligent and appropriate manner and have, at all times, acted in good faith. The Debtors have now filed a confirmable Plan that has the support of the majority of its pre-petition unsecured debt. The Debtors' good faith progress in theses cases cannot be denied.

Finally, the *Ad Hoc* Committee's argument that the Debtors' Board of Directors lacks the authority to propose and seek confirmation of the Plan is not properly before the Court on this appeal, as these corporate governance issues are joined in the Shareholder Motion, which has not yet been ruled upon by the Bankruptcy Court. In any event, the Debtors' board has proceeded at all times with full authority as permitted by the Bankruptcy Code and Delaware corporate law.

## **ARGUMENT**

Section 1121(b) of the Bankruptcy Code gives a debtor the exclusive right to file a plan of reorganization for an initial period of 120 days from the Petition Date. If the debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances to its plan. 11 U.S.C. § 1121(c). During the Exclusive Periods, no other party in interest may file a competing plan of reorganization. Section 1121(d) provides that the Bankruptcy Court may extend the Exclusive Periods "for cause" upon request of a party in interest and after notice and a hearing.

Although Section 1121(d) does not define "cause," courts have identified a variety of factors as being relevant to determine whether cause exists to extend the Exclusive Periods. These factors include:

(a)    the size and complexity of the case;

(b)    the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;

(c)    the existence of good faith progress toward reorganization;

(d)    the fact that the debtor is paying its bills as they become due;

(e)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f)    whether the debtor has made progress in negotiations with its creditors;

(g)    the amount of time which has elapsed in the case;

(h)    whether the debtor is seeking the extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

(i)    whether an unresolved contingency exists.

*See* In re Express One Int'l Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); *see also* In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409 (E.D.N.Y. 1989); In re Grand Traverse Dev. Co. Ltd. P'ship, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992); In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y 1987).  Section 1121 "grants great latitude to the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusive period on a showing of 'cause.'"  In re Geriatrics Nursing Home, 187 B.R. at 132.

## I.    THE BANKRUPTCY COURT DID NOT PLACE THE BURDEN OF PROOF ON THE *AD HOC* COMMITTEE TO OPPOSE THE EXCLUSIVITY MOTION.

The *Ad Hoc* Committee's argument that the Bankruptcy Court improperly placed the burden upon the *Ad Hoc* Committee to oppose the Exclusivity Motion ignores the complete record of the Hearing and the express language of the Exclusivity Order.

At the Hearing, the Bankruptcy Court incorporated, without objection, the extensive Krull Proffer which included a detailed description of the Debtors' businesses, the Debtors' managements' outstanding operational performance, the obstacles to confirmation faced by the Debtors during these cases and the good faith efforts undertaken by the Debtors to develop a confirmable and consensual plan in light of the judicial decisions on substantive consolidation and asbestos claims estimation. *See* January Transcript at 10. The *Ad Hoc* Committee was provided with an opportunity to cross examine Mr. Krull, but they declined. *See* January Transcript at 9. The Debtors then described the filed Plan for the Bankruptcy Court and detailed the timing, strategy and efforts undertaken by the Debtors to negotiate the Plan and obtain support for the Plan among the Debtors' major creditor groups. *See* January Transcript at 10-21.

Counsel for the *Ad Hoc* Committee argued at the Hearing, without any evidentiary support, that equity would be entitled to a distribution from the Debtors' estates if the FAIR Act was passed by Congress[5] and that the Debtors were not pursuing their Plan in good faith solely because (a) the Plan does not take into account the possibility that the FAIR Act may be passed by Congress; and (b) the Debtors had not included the out of the money equity holders in plan negotiations. *See* January Transcript at 34-41. At no time did the *Ad Hoc* Committee introduce any evidence below of the Debtors' solvency, and the Bankruptcy Court found that "[t]here is no evidence before me that the debtor is solvent at this point in time in any way" and "I don't see how at this

---

[5]    There is no evidence, and it is not clear, that equity holders would be entitled to a distribution from the Debtors' estates even if the FAIR Act was passed by Congress in its present iteration.

point equity is entitled to a distribution or will get a distribution under any scenario." *See* January Transcript at 73.

After considering all the proffers, evidence and arguments at the Hearing, the Bankruptcy Court had little trouble concluding that the Debtors met their burden and that an extension of the Exclusive Periods was warranted. *See* January Transcript at 42-43. On February 13, 2006, the Bankruptcy Court entered the Exclusivity Order, which included the express finding that "cause exists to extend the Exclusive Periods through and including July 31, 2006, . . .."[6] Exclusivity Order at p. 2.

The extensive record below and the specific findings in the Exclusivity Order make clear that the Bankruptcy Court did not place the burden on the *Ad Hoc* Committee to terminate exclusivity. To the contrary, the burden of proof on the Exclusivity Motion at all times rested with the Debtors and the Bankruptcy Court appropriately exercised its discretion to conclude that the Debtors had met their burden.

## II.    THE DEBTORS HAVE MADE GOOD FAITH PROGRESS TOWARD REORGANIZATION.

Although the Debtors strongly disagree with the *Ad Hoc* Committee's arguments that the Plan was not proposed in good faith, the *Ad Hoc* Committee will be able to raise these arguments, and the Bankruptcy Court will decide this issue, in the context of confirmation of the Plan as required under 11 U.S.C. § 1129(a)(3). At this stage of the case, the issue is whether the Debtors have made good faith progress toward plan confirmation. *See* In re Express One Int'l Inc., 194 B.R. at 100. As demonstrated at the

---

[6]    At one point in the Hearing, the Bankruptcy Court responded to the *Ad Hoc* Committee's arguments by stating "I see no basis on which to terminate the debtor's exclusivity under these circumstances." Contrary to the *Ad Hoc* Committee's position, this one isolated sentence was by no means the sole basis of the Bankruptcy Court's decision to extend the Exclusive Periods.

Hearing and below, the Debtors' good faith progress toward confirmation was unrebutted.

After five years in bankruptcy, the decisions on substantive consolidation and asbestos claims estimation provided all parties with sufficient clarity to permit meaningful negotiations which ultimately led to the Debtors' filed Plan and Disclosure Statement.  As noted, the filed Plan has the support of over 85% of the Debtors' pre-petition unsecured claims, which represents a significant and recent development.  The Debtors' filed Plan is confirmable, a view shared on a preliminary basis by the Bankruptcy Court, "from a first blush, first read, *prima facie* level it looks as though this plan can be confirmed."  *See* January Transcript at 42.  As also recognized by the Bankruptcy Court, the Debtors' good faith progress towards reorganization was clear, "I see nothing in this case which indicates that the debtor is acting in bad faith."  *See* January Transcript at 38.  "I think the debtor has done what the Court has ordered and what its fiduciary obligations are to all constituents."  *See* January Transcript at 38-39, 42.  The Bankruptcy Court's findings are entitled to great deference.  In re Geriatrics Nursing Home, 187 B.R. at 131.

The Debtors do not quarrel with the *Ad Hoc* Committee's position that a debtor has a duty is to maximize value, *see e.g.* Bank of America Nat'l Trust and Sav. Ass'n. v. 203 N. LaSalle Street P'ship, 526 U.S. 434, 453 (1999), but vehemently disagree that they have somehow violated this duty by proposing a Plan which accepts the facts and law as they exist today, as oppose to a plan which, based upon pure speculation, provides for a recovery to a hopelessly out of the money class.

For good reason founded in common sense, there is no case law or statute that imposes upon a debtor the requirement to negotiate with an out of the money class; or propose a plan that takes into account the possibility of changes in the law or the law of the case. As appropriately found by the Bankruptcy Court, "[t]here is no law at the moment that the debtor has to take cognizance of, and I'm certainly not going to order the debtor to take cognizance of a statute that doesn't exist." *See* January Transcript at 43.

The existence of FAIR Act plan provisions in other cases does not mean that the Debtors here have proceeded in bad faith. As noted by the Bankruptcy Court, such provisions are irrelevant to the Debtors' cases, as "[e]very case is adjudged on its own facts." *See* January Transcript at 38.

The *Ad Hoc* Committee's "thrown in" argument that the Debtors are somehow using exclusivity as a "tactical device," like its other arguments, finds no support in the record below. The filed Plan is a testament to the Debtors' good faith progress and the benefits of continuing exclusivity in bankruptcy cases of this nature. The fact that the *Ad Hoc* Committee does not like its treatment under the Plan does not mean that the Debtors have used exclusivity as a tactical device. If it did, then any class unhappy with its proposed plan treatment could prevent a debtor from extending its Exclusive Periods. Again, the *Ad Hoc* Committee's argument finds no support in the facts or the law, and the Bankruptcy Court appropriately exercised its discretion to extend the Exclusive Periods.

### III. THE *AD HOC* COMMITTEE'S CORPORATE GOVERNANCE ARGUMENTS ARE NOT PROPERLY BEFORE THE COURT, AND IN ANY EVENT, ARE WRONG AS A MATTER OF LAW

The *Ad Hoc* Committee's final argument on appeal is based upon the faulty proposition that the Debtors' officers and directors "do not have the legal authority to

propose the Plan or seek its confirmation." *See* Brief at 11. As is clear from the *Ad Hoc*

Committee's own Brief, *see* Brief at p. 12, this argument is joined before the Bankruptcy

Court in the Shareholder Motion. The Bankruptcy Court, however, has not yet ruled on

the Shareholder Motion. In fact, on February 28, 2006, the *Ad Hoc* Committee filed a

Petition for Writ of Mandamus, asking this Court to direct the Bankruptcy Court to

adjudicate the Shareholder Motion. *See* In re Owens Corning, Inc., *et al*., United States

District Court for the District of Delaware, Case No. 06-136, Docket No. 1. By

Memorandum and Order dated March 23, 2006 (the "March 23 Order"), this Court

denied the *Ad Hoc* Committee's Petition finding, *inter alia*, that the *Ad Hoc* Committee's

position that it has a valid interest in the Debtors' reorganization proceeding was, at this

point, "entirely speculative." Bankr. Docket No. 17248 at 2.

This Court's appellate jurisdiction derives from 28 U.S.C. § 158, which provides

in relevant part as follows: "(a) The district courts of the United States shall have

jurisdiction to hear appeals (1) from final judgments, orders, and decrees; . . . and, with

leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in

cases and proceedings referred to the bankruptcy judges under section 157 of this title."

*See* 28 U.S.C. § 158(a). Accordingly, issues not yet decided by the Bankruptcy Court are

not appropriately before this Court on appeal. *See e.g.*, In re Christian, 804 F.2d 46, 49

($3^d$ Cir. 1986) (issues not decided by the bankruptcy court are not properly before the

district court on appeal pursuant to 28 U.S.C. § 158(a)); Flom v. Hedback (In re Flom),

814 F.2d 558 (8th Cir. 1987) (same).

Because the *Ad Hoc* Committee's corporate governance arguments have not yet

been decided by the Bankruptcy Court, there is no final or interlocutory order on these

issues which can serve as the jurisdictional basis for consideration of these issues by this

Court. This point is conceded by the *Ad Hoc* Committee in its Petition for Writ of

Mandamus, "the *Ad Hoc* Committee cannot seek reconsideration of or relief from the

Bankruptcy Court's failure to address the [Shareholder] Motion and directive to continue

the Motion on a month-to-month basis, or take an appeal therefrom." *See* Dist. Ct. Case

No. 06-136, Docket No. 1 at 10. For these reasons, at this time, this Court lacks

jurisdiction to consider the *Ad Hoc* Committee's challenge to the Exclusivity Order based

upon the corporate governance arguments contained in its Shareholder Motion.

In any event, the *Ad Hoc* Committee's argument that the Debtors' directors and

officers are not acting with appropriate legal authority is wrong as a matter of law.

Delaware law defers to federal bankruptcy courts in overseeing a debtor's corporate

decisions without requiring approval of the debtor's shareholders or directors. Del. Code

Ann. tit. 8, § 303. Under Delaware law, the Debtors may take corporate actions, as

ordered by the Bankruptcy Court, without further action by the Board of Directors or

shareholders. Id. Section 303 of Title 8 of the Delaware Code states:

> Any corporation of this State, an order for relief with respect to which has
> been entered pursuant to the Federal Bankruptcy Code, 11 U.S.C. § 101 *et
> seq.*, or any successor statute, may put into effect and carry out any
> decrees and orders of the court or judge in such bankruptcy proceeding
> and may take any corporate action provided or directed by such decrees
> and orders, without further action by its directors or stockholders. Such
> power and authority may be exercised, ... with like effect as if exercised
> and taken by unanimous action of directors and stockholders of the
> corporation.

Del. Code Ann. tit. 8, § 303(a). At least one bankruptcy court has explicitly found that

"§ 303 supplies sufficient Delaware statutory authorization for [a debtor] to operate,

during the remaining pendency of its reorganization proceedings, without a board of

directors." In re United Press Int'l., 60 B.R. 265, 274 (Bankr. D. Dist. Col. 1986).

Moreover, "[c]ourts have consistently held that abrogation of unexercised shareholder

rights during reorganization proceedings can be an appropriate action on the part of the

Bankruptcy Court." In re Federated Dept. Stores, Inc., 133 B.R. 886, 893 (S.D. Ohio

1991) (citing In re Johns-Manville Corp., 52 B.R. 879 (Bankr. S.D.N.Y. 1985)).

Accordingly, since the Debtors have been operating under the supervision of and

pursuant to orders of the Bankruptcy Court, as a matter of Delaware corporate law, no

meeting of shareholders has been necessary during the pendency of these bankruptcy

proceedings.  Further, under Delaware law, "[a] failure to hold the annual meeting at the

designated time or to elect a sufficient number of directors to conduct the business of the

corporation shall not affect otherwise valid corporate acts ... except as may be otherwise

specifically provided in this chapter."  Del. Code Ann. tit. 8, § 211(c).

 While the *Ad Hoc* Committee claims that it has the right to challenge the actions

of the Owens Corning board taken during the bankruptcy process, including any action

"with respect to a plan of reorganization that purports to wipe out equity" (Shareholder

Motion, ¶ 40), such a challenge would have no basis to the extent the Plan were

ultimately confirmed by the Bankruptcy Court.  Under § 303(a), all court orders,

including a confirmation order, would have the effect of unanimous approval of the

Debtors' shareholders and directors.  Del. Code Ann. tit. 8, § 303(a).  As recognized by

this Court in the March 23 Order, the *Ad Hoc* Committee will "not be precluded from

protecting its own interests – whatever they may be – in the plan confirmation

proceedings."  *See* Bankr. Docket No. 17248 at 2.

In summary, the Debtors' board has, at all times, acted with appropriate authority under the Bankruptcy Code and Delaware corporate law.

## CONCLUSION

For all of the foregoing reasons, the *Ad Hoc* Committee's appeal should be denied and the Bankruptcy Court's Exclusivity Order should be affirmed in its entirety.


**SAUL EWING LLP**

By: _____

Norman L. Pernick (No. 2290)
Mark Minuti (No. 2659)
J. Kate Stickles (No. 2917)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE  19899-1266
(302) 421-6800

**SIDLEY AUSTIN LLP**
James F. Conlan
Larry J. Nyhan
Jeffrey C. Steen
Dennis M. Twomey
One South Dearborn Street
Chicago, IL  60603
(312) 853-7000

- And -


Guy S. Neal
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000


Attorneys for Appellee, Owens Corning, *et al.*

Dated:  April 18, 2006

534850.1 4/18/06

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re OWENS CORNING, INC., *et al.*,<br><br>Debtors. | Bankruptcy Case No. 00-3837 (JKF) |
| *AD HOC* COMMITTEE OF PREFERRED AND EQUITY SECURITY HOLDERS,<br><br>Appellant,<br><br>v.<br><br>OWENS CORNING, *et al.*,<br><br>Appellee. | Civil Action No. 06-184 (JPF) |

## ANSWERING BRIEF OF APPELLEE, OWENS CORNING, *ET AL.*
## CERTIFICATE OF SERVICE

I, Mark Minuti, hereby certify that on April 18, 2006, the foregoing **Answering Brief Of Appellee, Owens Corning,** *et al.* was served on the parties on the attached service list in the manner indicated therein.

Mark Minuti (No. 2659)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6800

**Owens Corning, *et al.***
***Ad Hoc* Committee of Preferred and Equity Security Holders**
**v. Owens Corning, *et al.* (Civil Action No. 06-184 (JPF))**
**SERVICE LIST - Answering Brief Of Appellee, Owens Corning, *et al.***

**Via Hand Delivery:**
Jeffrey C. Wisler, Esquire
Christina M. Thompson, Esquire
Marc J. Phillips, Esquire
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE  19899

William H. Sudell, Jr., Esquire
Eric D. Schwartz, Esquire
Morris, Nichols, Arsht and Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347

David M. Klauder, Esquire
Office of the U.S. Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE  19801-3519

Marla Eskin, Esquire
Mark Hurford, Esquire
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE  19801

Richard W. Riley, Esquire
Duane Morris LLP
1100 N. Market Street, Suite 1200
Wilmington, DE  19801

Francis A. Monaco, Jr., Esquire
Monzack & Monaco, P.A.
1201 Orange Street, Suite 400
Wilmington, DE  19801

Edwin Harron, Esquire
Sean T. Greecher, Esquire
Young Conaway Stargatt & Taylor, LLP
1001 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

**Via Telecopy and**
**First Class U.S. Mail:**
Edward S. Weisfelner, Esquire
Robert J. Stark, Esquire
Brown Rudnick Berlack Israels LLP
Seven Time Square
New York, NY  10036

Anthony L. Gray, Esquire
John C. Elstad, Esquire
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA  02111

Peter Van N. Lockwood, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C.  20005

Elihu Inselbuch, Esquire
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY  10152

Lewis Kruger, Esquire
Kenneth Pasquale, Esquire
Denise K. Wildes, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY  10038

James I. McClammy, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Jane W. Parver, Esquire
Andrew A. Kress, Esquire
Edmund Emrich, Esquire
Kaye Scholer, LLP
425 Park Avenue
New York, NY 10022

J. Andrew Rahl, Jr., Esquire
John B. Berringer, Esquire
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

William S. Katchen, Esquire
Duane Morris LLP
744 Broad Street, Suite 1200
Newark, NJ 07102

James F. Conlan, Esquire
Larry Nyhan, Esquire
Jeffrey C. Steen, Esquire
Sidley Austin LLP
1 South Dearborn Street
Chicago, IL 60603

# Exhibit "1"

Palms Associates v. Video Update, Inc.,
2005 WL 1277741 (D. Del. May 19, 2005)

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2005 WL 1277741 (D.Del.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: VIDEO UPDATE, INC., et al. Debtors.
PALMS ASSOCIATES, Appellant,
v.
VIDEO UPDATE, INC., et al. Appellees.
**No. 00-3663 (JHW), Civ.A. 03-18(GMS), ADV. 02-276.**

May 19, 2005.

William K. Harrington, Duane Morris LLP, Wilmington, DE, for Debtors/Appellees.
Michelle McMahon, Connolly, Bove, Lodge & Hutz, Wilmington, DE, for Appellant.

*ORDER*

SLEET, J.
**\*1** 1. On January 9, 2003, Palms Associates ("Palms") filed an **appeal** from the November 25, 2002 **Order** of the United States **Bankruptcy Court** for the District of Delaware ("**Bankruptcy Court**"), which authorized Video Update, Inc., et al.'s (the "debtors") assumption of a ground lease between Palms and the debtors, and overruled Palms' objection to confirmation of the debtors' Plan of Reorganization (the "Plan").
2. The facts of this action are set forth in the Bankruptcy Court's October 4, 2002 unpublished opinion, *In re Video Update, Inc., et al.,* Case Nos. 00-3663 through 00-3683(JHW) (D.I.1789.)
3. The court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a) (2004). In reviewing a case on appeal, the Bankruptcy Court's factual determinations will not be set aside unless they are clearly erroneous. *See Mellon Bank, N.A. v. Metro Comm., Inc.,* 945 F.2d 635, 641 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620, (1992). Conversely, a Bankruptcy Court's conclusions of law are subject to plenary review. *See id.* Mixed questions of law and fact are subject to a "mixed **standard of review**." *See id.* at 641-42. Under this "mixed **standard of review**," the appellate court accepts findings of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application

of those precepts to historical facts." *Id.*
4. After reviewing the opinion of the Bankruptcy Court under a plenary **standard of review**, the court concludes that the Bankruptcy Court correctly determined that the lease between the parties did not terminate pre-petition (*i.e.* it remained executory on the date that the debtors filed for bankruptcy) and could properly be assumed by the debtors pursuant to 11 U.S.C. § 365(a).

FN1. The parties filed a stipulation with the Bankruptcy Court on January 30, 2002, in which they stipulated to the basic facts of this matter.

a. First, the court agrees with and adopts the Bankruptcy Court's analysis and conclusion that because the October 5, 1999 letter from Palms to the debtors contained defects it did not effectively serve to terminate the lease between the parties.
b. The court also adopts the analysis and conclusion reached by the Bankruptcy Court regarding the Virginia District Court judgment, dated October 29, 1999, namely, that the Bankruptcy Court had to examine whether the lease terminated pre-petition without resort to the District Court judgment. *See Ragan v. Woodcroft Village Apartments,* 255 Va. 322, 497 S.E.2d 740, 742 (Va.1998) ("The purpose of this two-tier trial system is to allow a party aggrieved by a final judgment of the general district court to have the case tried again by the circuit court as if the case originally had been instituted there. Such an appeal is in effect a statutory grant of a new trial, in which the perfected appeal annuls the judgment of the district court as completely as if there had been no previous trial.")
c. In addition, the court adopts the Bankruptcy Court's rationale and conclusion that the Allen Mechanics Lien was not the basis for Palms' purported termination of the lease. *See In re Video Update, Inc., et al.,* Case Nos. 00-3663 through 00-3683(JHW), at 6-7 (according to the parties' stipulation, Palms notified the debtors that the lease was terminated due to only non-payment of September 1999 and October 1999 rents).
**\*2** 5. Lastly, because the court has concluded that the Bankruptcy Court correctly determined the lease could be assumed by the debtors, it concludes that the Bankruptcy Court properly overruled Palms'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 2
Slip Copy, 2005 WL 1277741 (D.Del.)
**(Cite as: Slip Copy)**

objection to the Plan.

For the aforementioned reasons, IT IS HEREBY
ORDERED that:

1. The November 25, 2002 Order of the Bankruptcy
Court is AFFIRMED.

D.Del.,2005.
In re Video Update, Inc.
Slip Copy, 2005 WL 1277741 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00018 (Docket) (Jan. 09, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit "2"

James Rowley, "Asbestos Fund Leaders
Seek Votes to Save Legislation,"
Bloomberg, Feb. 14, 2006

ATT4653978.txt
Asbestos Fund Leaders Seek Votes to Save Legislation (Update1)
2006-02-14 14:07 (New York)

        (Adds Frist comment in fourth paragraph.)

By James Rowley
        Feb. 14 (Bloomberg) -- U.S. Senate supporters of a company-
financed $140 billion fund for asbestos exposure victims sought
to round up votes today to save the endangered proposal.
        Senator Arlen Specter, the legislation's chief sponsor, said
he doesn't know if he can gather the required 60 votes to
overcome an objection that the measure violates a congressional
rule limiting federal spending. Republicans control the Senate,
55-45, and the asbestos plan has some Democratic support.
        ''It's not easy to get 60 votes on a controversial bill like
this, but we are working on it,'' Specter, a Pennsylvania
Republican, told reporters. He said Senate leaders might postpone
the vote on the budget objection until supporters are more
confident they have the votes to defeat it.
        Senate Majority Leader Bill Frist, anticipating a close
vote, said he would shelve the legislation if it is blocked this
week. ''If we are unsuccessful this week in addressing asbestos,
that is it for this year,'' said Frist, a Tennessee Republican.
        The fund would end asbestos litigation that has forced
almost 80 companies into bankruptcy court, such as USG Corp., the
world's largest wallboard maker. Asbestos producers and
distributors and their insurers would finance the fund.

                        Business Is Divided

        The bill has divided business and organized labor. Large
companies such as General Electric Co. and Honeywell
International Inc. favor the plan because they would pay less
into the fund than to contest asbestos lawsuit claims. Smaller
companies, such as gas and oil engineering services provider
Foster Wheeler Ltd., say they would be forced to contribute too
much to the fund.
        Insurers such as Liberty Mutual Group Inc. and St. Paul
Travelers Cos. Inc. oppose the legislation because it doesn't
guarantee there would be no further asbestos litigation if the
fund were to fail.
        Frist moved last night to cut off debate on the measure and
on a substitute amendment Specter proposed when debate began last
week.
        Frist's move sets up two procedural hurdles as early as
tomorrow. It takes 60 votes to end debate on both the amendment
and the underlying legislation.
        ''The strategy is to move the bill along if we can,'' said
Specter, chairman of the Senate Judiciary Committee. He said he
has received ''a good response from a fair number of Democrats,
but the Democratic leadership is working it hard'' to defeat the
bill.
        Senate Democratic Leader Harry Reid, calling the measure one
of the worst pieces of legislation ever, has urged Democrats to
vote against waiving the budget rule, thus dooming the measure.

                        Vote Counting

        Vote counters say there are 10 to 15 Democrats who may
support waiving the budget rule. Nine Democrats, including four
sponsors of the asbestos bill, are considered solid votes to
overturn the budget objection and six others are possible
                        Page 1

ATT4653978.txt

supporters of the motion, according to Democrats and Republicans.
    The bill's opponents need 41 votes to kill the measure.
Nevada Republican John Ensign, who raised the budget objection,
said he believes he has the votes to block the fund.
    Texas Republican John Cornyn, who opposes the measure, says
the outcome is uncertain. He said he would vote to waive the
budget rule even though he wants ``a better bill.''
    Cornyn didn't hold out much hope the fund would be approved.
``I said at one point it's going to take a miracle for this bill
to become law,'' he said.  While I believe in miracles, I am not
sure this one is going to come true.''
    Supporters took comfort in a new Congressional Budget Office
letter that the measure wouldn't increase the federal deficit
over the fund's 50-year life.

### `Deficit Neutral'

    ``The bottom line from CBO is that this bill is `deficit
neutral.' There is no reason to sustain the budget'' objection,
Specter and Vermont Senator Patrick Leahy, the top Democratic
sponsor, said in a statement.
    Specter has argued any budget violations are mere
technicalities because the government-run trust would just
distribute money raised from companies.
    Still, the Congressional Budget Office said that revenues
would fall short by $7 billion in the first decade of the fund's
operation, forcing it to borrow. The office also said that
``substantial payments from the fund could continue well after
2015'' and result in more than $5 billion in federal spending in
at least one of the decades between 2016 and 2055.
    Cornyn said the budget office's letter doesn't resolve his
most serious worry, that borrowing to cover revenue shortfall
would lead to insolvency.
    ``If the fund is going to be so stressed'' as one
consultant's report concluded,  then its going to be insolvent
in a matter of years,'' Cornyn said.

### Federal Money

    Specter disagreed. ``I don't think you can read the CBO
report cutting any way but in favor of the bill,'' he said.  The
CBO flatly says there is no federal money involved.''
    The budget office's latest report didn't address the
agency's earlier projection that claims against the fund could
range from $120 billion to $150 billion. In December, the agency
said there was a `significant likelihood'' the fund wouldn't
collect enough money from companies to pay all claims.

--Editor: Rubin.

Story illustration: For government stories, see
{TOP GOV <GO>}. For stories about asbestos, see
{NI ASBESTOS <GO>}. For stories about asbestos-related suits see
{TNI ASBESTOS LAW <GO>}. For
the Asbestos Alliance's Web site see
http://www.asbestossolution.org.
To read the Congressional Budget Office's reports on
asbestos legislation see http://www.cbo.gov

To contact the reporter on this story;
James Rowley at 1-202-624-1913 or
jarowley@bloomberg.net

ATT4653978.txt

To contact the editor responsible for this story:
Ken Fireman at (1) (202) 624-1978 or
kfireman1@bloomberg.net

[TAGINFO]

OWENQ US <Equity> CN
USG US <Equity> CN
OI US <Equity> CN
GRA US <Equity> CN
CB US <Equity> CN
DOW US <Equity> CN
FDMLQ US <Equity> CN
DD US <Equity> CN
HIG US <Equity> CN
S US <Equity> CN
GM US <Equity> CN
HON US <Equity> CN
HAL US <Equity> CN
AIG US <Equity> CN
CB US <Equity> CN
BRK/A US <Equity> CN
TAP/B US <Equity> CN
STA US <Equity> CN

NI NJ
NI FIN
NI CONS
NI AUT
NI EXE
NI MI
NI CNG
NI AUP
NI MD
NI DRG
NI CMD
NI ASBESTOS
NI TRN
NI LAW
NI DE
NI CHM
NI RET
NI INS
NI POL
NI IL
NI DC
NI PAC
NI HEA
NI CT
NI BMRFER
NI OH
NI GOV
NI CST
NI BLD
NI GEN
NI COS
NI BDA
NI CNG
NI SENATE

#<610849.263818.2005-11-10T14:40:00.25>#

Page 3

```
                            ATT4653978.txt
#<610849.263818.2005-11-10T14:40:00.25>#
-0- Feb/14/2006 19:07 GMT
```

# Exhibit "3"

Brody Mullins, "Asbestos Trust Fund Bill
is Defeated," Wall St. J., Feb. 15, 2006



**THE WALL STREET JOURNAL.**
ONLINE

FORMAT FOR PRINTING sponsored by **TOSHIBA** *Don't copy. Lead.*

February 15, 2006

# Asbestos Trust Fund Bill Is Defeated

**Effort to Overhaul System
Of Litigating Claims Fails;
Loss for Big Manufacturers**

By BRODY MULLINS
*February 15, 2006; Page A10*

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

WASHINGTON -- A handful of Republicans joined most Democrats in dealing a deathblow last night to a $140 billion asbestos-litigation overhaul bill on Capitol Hill.

On a 58-41 vote, supporters of the asbestos bill failed to muster the 60 votes needed to clear a procedural hurdle raised by their opponents.

After the vote, Senate Majority Leader Bill Frist's office said that Republicans may bring the legislation back to the Senate floor later this year. Earlier in the day, Mr. Frist told reporters that this was the only week he would devote to the bill on the Senate floor.

However, proponents are unlikely to be successful this year. As it languished on Capitol Hill, a growing number of states, including Texas, have approved their own asbestos-overhaul laws that many U.S. corporations and insurance companies find favorable.

The bill under consideration in the Senate sought to revise the asbestos-litigation system by creating a $140 billion trust fund to pay health-care and other costs incurred by Americans injured by asbestos. The fund would be paid for primarily by companies with asbestos liabilities and their insurance companies.

Large U.S. manufacturers of asbestos and some insurance companies backed the bill because it would have reduced the amount of money they would have to pay in asbestos liabilities through the legal system.

But a growing number of smaller manufacturers and insurers opposed the legislation because it would increase the amount of money they would have to pay. Most trial lawyers also opposed the bill.

Since the early 1970s, industry has paid $70 billion to settle 730,000 asbestos claims, according to a recent Rand Corp. survey. At least 77 companies have filed for bankruptcy-court protection because of asbestos liability.

Sen. Arlen Specter of Pennsylvania crafted legislation that won the backing of a coalition of Republicans and Democrats. Mr. Specter argued that the bill would help asbestos victims receive

compensation for their illnesses and give companies certainty about how much they would owe.

But the bill was attacked by an odd coalition of conservative Republicans like Sen. Sam Brownback of Kansas, who believed the trust fund was too generous, and liberal Democrats like Sen. Edward Kennedy of Massachusetts, who said the bill was a giveaway to big business.

"It does not provide a reliable guarantee of just compensation to the enormous number of workers who are suffering from asbestos-induced disease," Mr. Kennedy said last week.

Opponents of the bill defeated it by raising a procedural motion that required Mr. Specter to find 60 senators to support the bill, rather than the usual 51 votes. Using a parliamentary tactic, opponents noted that the asbestos trust fund would need to borrow federal funds at the beginning to get off the ground, a violation of the chamber's budget rules.

Even if Mr. Specter had prevailed, he faced more challenges in the days ahead. Mr. Reid and Senate Democrats planned to launch a filibuster against the bill, forcing Mr. Specter to again find 60 votes to defeat his opponents.

Last night, Mr. Specter held out hope for the bill. He said Sen. Daniel Inouye of Hawaii was the one senator who didn't vote, and had planned to vote with Mr. Specter on the bill. According to Mr. Specter, Mr. Inouye left the Capitol because his wife was sick. With Mr. Inouye's and Mr. Frist's votes, the bill would have the requisite 60 votes. Mr. Frist had changed his vote to oppose the bill, so under Senate rules he would be able to bring the bill back to the Senate floor.

Among the Republicans who voted against Mr. Specter were Sens. Judd Gregg of New Hampshire, James Inhofe of Oklahoma and John McCain of Arizona. Democrats voting to defeat the bill were Mr. Reid and Sens. John Kerry of Massachusetts, Ben Nelson of Nebraska and Kent Conrad of North Dakota. The Democrats who supported Mr. Specter included Sen. Patrick Leahy of Vermont.

**Write to Brody Mullins at brody.mullins@wsj.com**[1]

**URL for this article:**
http://online.wsj.com/article/SB113997553681374401.html

**Hyperlinks in this Article:**
(1) mailto:brody.mullins@wsj.com

**Copyright 2006 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

# Exhibit "4"

James Gunsalus, "W.R. Grace, Owens Corning Fall After Asbestos Legislation Fails," Bloomberg, Feb. 15, 2006

ATT5085616.txt
W.R. Grace, Owens Corning Fall After Asbestos Legislation Fails
2006-02-15 11:23 (New York)

By James Gunsalus
    Feb. 15 (Bloomberg) -- Shares of W.R. Grace & Co. and Owens
Corning, which are defending themselves against asbestos-related
lawsuits, fell after a proposed $140 billion fund for asbestos-
exposure victims was blocked in the U.S. Senate yesterday.
    W.R. Grace, a chemical and building materials maker whose
asbestos liabilities forced it into bankruptcy in 2001, dropped
as much as 13 percent. Owens Corning, also under Chapter 11
protection for the past five years, fell as much as 38 percent.
Owens Corning is the biggest U.S. maker of insulating material.
    The fund failed to overcome an objection that it would cost
taxpayers billions of dollars. Fund supporters fell one vote
short of the required 60 to waive a budget rule barring
legislation that increases government spending by $5 billion in
any of four decades after 2016.
    The companies are facing thousands of lawsuits from people
who were exposed to asbestos while on the job or from products
they bought. Exposure to asbestos, widely used in insulation,
fireproofing and other building material applications since the
early 1900s, can cause scarring of the lungs and cancer.
    W.R. Grace dropped 76 cents, or 7.7 percent, to $9.18 as of
11:19 a.m. in trading of 4.69 million shares, almost five times
the three-month average daily volume. Earlier they fell to $8.67
in New York Stock Exchange composite trading. Owens-Corning
dropped $1.31 to $2.65, a decline of 33 percent. Trading of 9.01
million shares was more than 10 times the average volume. The
stock earlier slid to $2.45.
    Opponents, citing a Congressional Budget Office study,
warned that the company-financed fund might not take in enough
revenue to cover all claims, forcing it to borrow money. The
chief sponsor of the bill, Republican Arlen Specter of
Pennsylvania, said the government would just be a conduit for
private financing, and the taxpayers wouldn't be at risk.
    The measure was intended to end asbestos lawsuits that have
forced into bankruptcy almost 80 companies. People with
respiratory disease or cancer would be paid from $25,000 to $1.1
million, depending on how sick they became from long-term
exposure to the fibrous mineral used to make brakes, roofing,
gaskets and other products.

--With reporting by James Rowley in Washington. Editor: Nol.

Story illustration: For government stories, see {TOP GOV <GO>}.
For stories about asbestos, see {NI ASBESTOS <GO>}. For stories
about asbestos-related suits see {TNI ASBESTOS LAW <GO>}. For
the Asbestos Alliance's web site see
http://www.asbestossolution.org.

To contact the reporter on this story:
James Gunsalus in New York at (1) (212) 617-2358 or
jgunsalus@bloomberg.net.

To contact the editor responsible for this story:
Michael Nol at (1) (212) 617-2384 or
mnol@bloomberg.net.

[TAGINFO]
OWENQ US <Equity> CN
USG US <Equity> CN
                                        Page 1

# Exhibit "5"

James Rowley and Michael McKee,
"Asbestos Trust Fund Alternative May Get
Debate, Senator Says," Bloomberg,
Feb. 16, 2006

ATT5180612.txt
Asbestos Trust Fund Alternative May Get Debate, Senator Says
2006-02-16 17:21 (New York)

By James Rowley and Michael McKee
      Feb. 16 (Bloomberg) -- The U.S. Senate, which blocked a
proposed company-financed fund for asbestos victims, may consider
an alternate approach to end the litigation crisis over the
cancer-causing material, said Senator John Ensign.
      Senate Republican Leader Bill Frist told lawmakers he may
permit debate on a new measure that would require plaintiffs to
show their illness was caused by asbestos exposure before they
could sue, Ensign said.
      ``If we have a large enough group of bipartisan senators,
then he could potentially schedule time on the floor for it,''
said Ensign, a Nevada Republican.
      A spokesman for Frist didn't immediately comment on Ensign's
remarks.
      The new approach was supported by 26 Republicans in a test
vote last week as the Senate debated the plan to end asbestos
lawsuits by creating a $140 billion trust fund financed by
companies. Asbestos litigation has forced almost 80 companies
into bankruptcy court.
      The trust fund approach was scuttled in a procedural vote by
the Senate this week. Nine Republicans joined Ensign in voting to
kill the fund.
      ``I don't think the current bill will come back to the
floor,'' Ensign said, referring to the fund proposal. The
alternative would be a measure imposing strict medical criteria
to weed out ``frivolous lawsuits,'' he said. ``If you eliminate
the people who are not sick, the potential liability goes down.''
      Democratic leader Harry Reid of Nevada has offered to work
with Republicans to craft such a measure. Ensign said a ``fairly
good-sized bipartisan group of senators is starting to work on
this legislation. I think we will be able to come up with
something that can be enacted this year.''

                    Specter's Position

      Trust-fund supporters, such as Pennsylvania Republican Arlen
Specter, say the medical criteria approach wouldn't help workers
who were employed by now bankrupt companies and wouldn't halt all
litigation.
      Under Senate procedures, supporters of the fund legislation
needed 60 votes to override Ensign's objection that blocked the
measure. Ensign objected that the trust would violate a
congressional limit placing a cap on spending.
      Fund supporters were one vote shy of 60, and Frist switched
his vote at the end to preserve his ability to seek another roll
call on the procedural obstacle.
      The trust legislation still ``has a heartbeat,'' said Frist,
a heart surgeon, after the Senate vote two days ago.

                    Seeking Assurances

      Republican Senate aides say Frist wouldn't seek to bring the
fund plan up again unless he is assured of winning 60 votes to
overcome Ensign's budget objection and other procedural hurdles.
      Specter held out hope yesterday that the fund idea isn't
dead. ``Senator Frist is trying to move back to a vote,'' he
said.
      Vermont Senator Patrick Leahy, the fund measure's chief
Democratic sponsor, declined yesterday to predict whether there
                         Page 1

ATT5180612.txt

would be another vote, saying that decision was up to Frist.
     Shares of insulation maker Owens Corning, which is in
bankruptcy reorganization, have dropped almost 50 percent in the
two days since the trust legislation was blocked. Owens Corning
shares fell 54 cents to $2.03 in over-the-counter trading today.

--Editor: Rubin.

Story illustration: For government stories, see
{TOP GOV <GO>}. For stories about asbestos, see {NI ASBESTOS
<GO>}. For stories about asbestos-related suits see
{TNI ASBESTOS LAW <GO>}. For the Asbestos Alliance's Web site see
http://www.asbestossolution.org.

To contact the reporter on this story:
James Rowley at 1-202-624-1913 or
jarowley@bloomberg.net

To contact the editor responsible for this story:
Ken Fireman at (1) (202) 624-1978 or
Kfireman1@bloomberg.net

[TAGINFO]
OWENQ US <Equity> CN
USG US <Equity> CN
OI US <Equity> CN
GRA US <Equity> CN
CB US <Equity> CN
DOW US <Equity> CN
FDMLQ US <Equity> CN
DD US <Equity> CN
HIG US <Equity> CN
S US <Equity> CN
GM US <Equity> CN
HON US <Equity> CN
HAL US <Equity> CN
AIG US <Equity> CN
CB US <Equity> CN
BRK/A US <Equity> CN
TAP/B US <Equity> CN
STA US <Equity> CN

NI NJ
NI FIN
NI CONS
NI AUT
NI EXE
NI MI
NI CNG
NI AUP
NI MD
NI DRG
NI CMD
NI ASBESTOS
NI TRN
NI LAW
NI DE
NI CHM
NI RET
NI INS
NI POL
NI IL
NI DC

ATT5180612.txt

```
NI PAC
NI HEA
NI CT
NI BMRFER
NI OH
NI GOV
NI CST
NI BLD
NI GEN
NI COS
NI BDA
NI CNG
NI SENATE
```

```
#<610849.263818.2005-11-10T14:40:00.25>#
-0- Feb/16/2006 22:21 GMT
```